1
2
3
4                          UNITED STATES DISTRICT COURT
5                        NORTHERN DISTRICT OF CALIFORNIA
6
7    ALEXANDER RUSSO, et al.,              Case No. 24-cv-00748-PCP
8                    Plaintiffs,
9            v.                            **ORDER RE: CROSS-MOTIONS FOR
                                           SUMMARY JUDGMENT**
10   FEDERAL MEDICAL SERVICES, INC., et
     al.,
11                   Defendants.
12

United States District Court
Northern District of California

13          This case arises from Alexander Russo and Eric Reddick's employment with defendants

14   Federal Medical Services, Inc. and Ben Fitzgerald Real Estate Services, LLC and their respective

15   representatives Jim Slattery, Abigail Woulfe, and Jerry Tate. Russo and Reddick allege that

16   throughout their employment the defendants violated California and federal law by failing to pay

17   them the minimum wage or a proper overtime wage and by preventing them from taking mandated

18   meal and rest breaks. The parties have all moved for summary judgment. For the reasons stated

19   herein and with limited exception, the motions are denied.

20                                       **BACKGROUND**

21          Federal Medical is a closely held Texas corporation with only a handful of employees.

22   During plaintiffs' employment with Federal Medical, the company employed about fourteen

23   individuals, most of whom were subcontractors. Jim Slattery is the sole shareholder, CEO, and

24   owner of Federal Medical. Ben Fitzgerald is also a Texas-based corporation. It is comprised of

25   three business units: a residential arm, a commercial arm, and a government business arm. Its

26   government arm does business as "Rosemark." Jerry Tate is the president of Ben Fitzgerald and

27   runs Rosemark. He owns fifty percent of Ben Fitzgerald and has no direct superiors in the

28

company.[1] Ben Fitzgerald has approximately fifty employees.

The relationship between Federal Medical and Ben Fitzgerald originated out of their decision to team up and bid for contracts with the United States Department of Veterans Affairs. Starting in approximately 2015, Ben Fitzgerald contracted to provide janitorial services at various VA buildings in Palo Alto, Menlo Park, and Livermore, California. At some point between 2015 and 2019, Ben Fitzgerald came to understand that VA contracting guidelines required the contract to be held primarily by a company owned by a service-disabled veteran. Tate is not a veteran. Slattery, however, is both a veteran and service-disabled. So Ben Fitzgerald and Federal Medical entered into a business arrangement to jointly solicit business on the contract and then provide janitorial services at the Palo Alto, Menlo Park, and Livermore facilities. This "teaming agreement" provided that Federal Medical would be the prime contractor and receive 51% of the revenue while Ben Fitzgerald would serve as a subcontractor and receive 49% of the revenue. The teaming agreement is vague as to each party's specific responsibilities under the contract, instead stating that the scope of work and contract workshare would either be "in accordance with [the] eventual [VA] contract" or otherwise "determined on a Contract by Contract basis."

In March 2019, Federal Medical won a bid from the VA to assume and oversee the contract previously held by Ben Fitzgerald. Evidence submitted by the parties suggests that very little changed in the day-to-day management of janitorial services at these VA locations when the contract formally transitioned in August 2019. Ben Fitzgerald oversaw on-site management of the janitorial staff, whereas Federal Medical oversaw administrative management.

Abigail Woulfe is Jerry Tate's daughter. Federal Medical employed her to supervise the janitorial staff directly. She stated that she understood her employment as "joint" between Ben Fitzgerald and Federal Medical. Although she worked primarily from Texas, she was the janitorial staffs' primary point of contact with both Federal Medical and Ben Fitzgerald, and she regularly conferred with both Slattery and Tate in making staffing decisions. Although Federal Medical and

---

[1] There are two other members of Ben Fitzgerald, LLC, each of whom own twenty-five percent of the business.

United States District Court
Northern District of California

United States District Court
Northern District of California

Ben Fitzgerald oversaw discrete parts of the contract, the formal boundaries of responsibility tended to blend together as Tate and Slattery consulted one another regularly. Woulfe was the conduit between the two halves of the contract. She was formally employed by Federal Medical, but worked with the staff of both companies, regularly consulted both Tate and Slattery, and maintained a Rosemark email address.

Federal Medical hired Renhill Staffing Service as its third-party HR, payroll, and staffing subcontractor. Renhill oversaw Federal Medical's HR and payroll services relating to the VA janitorial contracts. The janitorial staff would communicate their hours worked to Woulfe, who would then transmit those hours to Renhill, which then issued paychecks.

Russo began working at the Menlo Park and Palo Alto facilities sometime between March and May of 2019. Ben Fitzgerald hired him as a janitor. When Federal Medical assumed the contract, it assumed Russo's contract from Ben Fitzgerald. Ben Fitzgerald's predecessor on the contract hired Reddick in 2013. Ben Fitzgerald assumed that contract when it took over as the prime contractor, and Federal Medical assumed Reddick's contract in August 2019. Russo and Reddick generally worked night shifts, often starting work around 6:00 p.m. or 7:00 p.m. and sometimes starting as late as 11:00 p.m. Their schedules rarely overlapped with Woulfe's working hours, but they remained in contact with her as needed. Reddick's employment with Federal Medical ended in April of 2023.[2] Russo was still employed by Federal Medical when he filed this lawsuit.

Russo and Reddick allege that Federal Medical, Ben Fitzgerald, Slattery, Tate, and Woulfe were all their "employers" for the purposes of state and federal wage-and-hour laws. Both allege that they regularly worked more than eight hours per day and/or 40 hours per week while employed by Federal Medical and Ben Fitzgerald. They further alleged that the companies failed

---

[2] The parties are not especially clear as to when Reddick's employment with Federal Medical ended. The complaint states that Reddick "was terminated" on May 10, 2023. In his declaration, Slattery stated that Reddick "resigned" on April 30, 2023. The declaration of Federal Medical's counsel states that Reddick resigned on April 3, 2024. Federal Medical's motion states that Mr. Reddick resigned "on or about April 30, 2023." Because Slattery's declaration is the only competent evidence before the Court on this issue, the Court will use April 30, 2023 as Reddick's date of termination.

to pay the required minimum and overtime wages for their hours worked. They also allege that the defendants failed to provide meal and rest breaks and to provide itemized wage statements as required by California law. The operative fourth amended complaint asserts seven causes of action under the California Labor Code, the California Unfair Competition Law, the California Private Attorneys General Act (PAGA), and the federal Fair Labor Standards Act.

This order addresses the parties' four cross-motions for summary judgment.

## LEGAL STANDARDS

Courts may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is material if it "might affect the outcome of the suit under the governing law." *Id.*

The moving party bears the initial burden to demonstrate a lack of genuine factual dispute. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). "When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex Corp.*, 477 U.S. at 325). The burden then shifts to the nonmoving party to "provide affidavits or other sources of evidence that 'set forth specific facts showing that there is a genuine issue for trial.'" *Devereaux*, 263 F.3d at 1076 (quoting Fed. R. Civ. P. 56(e)). Courts "must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

Rule 56(a) allows a court to enter summary judgment on entire claims or defenses or on a "part of each claim or defense." Partial summary judgment is a "pretrial adjudication that certain issues shall be deemed established for the trial of the case." Fed. R. Civ. P. 56 advisory committee's note to 1946 amendment. This "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." *Id.*

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ANALYSIS**

The parties cross-move for summary judgment on some of the most heavily contested questions in this case. First, the parties cross-move for summary judgment as to Slattery, Tate, and Ben Fitzgerald's status as "employers" under California and federal law. Second, the parties cross-move for summary judgment as to the individual defendants' liability under California Labor Code § 558.1(a).[3] Third, plaintiffs seek summary judgment on the question of whether the alleged violations of state and federal employment laws were "willful." Finally, all parties seek summary judgment on questions related to plaintiffs' PAGA claims. Plaintiffs ask the Court to declare that Russo is an "aggrieved employee" and thus has standing to pursue representative PAGA claims at trial. Federal Medical seeks dismissal of Reddick's PAGA claims as barred by the statute of limitations and Russo's representative PAGA claims as lacking evidentiary support. Ben Fitzgerald asks the Court to dismiss Russo's PAGA claims due to improper notice.

**I.    Defendants' status as plaintiffs' "employers" under California law.**

**A.    Joint employment relationship.**

In moving for summary judgment, Ben Fitzgerald argues that because Federal Medical employed plaintiffs, Ben Fitzgerald could not have been plaintiffs' employer as a matter of law. Plaintiffs cross-move, arguing that Ben Fitzgerald and Federal Medical were their joint employers.[4]

California courts recognize that more than one entity can be a worker's "employer" for the purpose of the state wage-and-hour laws at issue in this case. *See, e.g.*, *Martinez v. Combs*, 49 Cal. 4th 35, 50 n.16 (2010) (collecting cases). This concept, which the parties refer to as a "joint employer relationship," is best "understood and applied by [ ] discarding the somewhat-dated assumption that an employee typically has … a single employer." *Jiminez v. U.S. Continental Mktg., Inc.*, 41 Cal. App. 5th 189, 189 n.8 (2019). Instead, courts simply consider which defendants satisfy the definition of "employer" in the applicable IWC order. As applicable here,

---

[3] Although plaintiffs moved for summary judgment as to liability for all individual defendants, Woulfe did not seek summary judgment on this question.

[4] Neither party sought summary judgment on Federal Medical's status as plaintiffs' "employer."

"[t]o employ … has three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." *Martinez*, 49 Cal. 4th at 64. This test is "phrased … in the alternative … [and] has the obvious utility of reaching situations in which multiple entities control different aspects of the employment relationship." *Id.* at 59.

Ben Fitzgerald largely premises its argument on the fact that, after August 2019, Federal Medical took over the VA contract and from that point forward, in Ben Fitzgerald's view, Federal Medical exercised control over the plaintiffs' working conditions. As noted already, Federal Medical assumed a 51 percent controlling share in the contract and served as the prime contractor from that point forward, whereas Ben Fitzgerald retained a 49 percent share. It is uncontested that Woulfe was a Federal Medical employee. Further, the two companies' teaming agreement specified that "employees of one [party] shall not be deemed to be the employees of the other."

This evidence could support the inference that Federal Medical, not Ben Fitzgerald, controlled the plaintiffs' working conditions. But this evidence does not entitle Ben Fitzgerald to summary judgment. Ben Fitzgerald relies on a formalistic interpretation of the relationship between the two companies based largely upon the teaming agreement, but "the terminology used in an agreement is not conclusive" because a "contract cannot … place an employee in a different position from that which he actually held." *Kowalski v. Shell Oil Co.*, 23 Cal. 3d 168, 176 (1979) (citations omitted). Plaintiffs have provided evidence that Ben Fitzgerald, through its government arm Rosemark, maintained a substantial role in managing the day-to-day operations of the contract even after Federal Medical assumed formal control. Although technically employed by Federal Medical, Woulfe understood her employment to be "joint" and regularly communicated with both Tate (the controlling shareholder of Ben Fitzgerald) and Slattery (the controlling shareholder of Federal Medical) about her management of the janitorial staff. Tate also communicated with Slattery about payment of Christmas bonuses to custodial staff, and Slattery stated in his deposition that, absent any issues, he generally gave Ben Fitzgerald full deference regarding the

management of personnel.[5] Slattery also testified that Ben Fitzgerald hired the plaintiffs, maintained their schedules, and oversaw all on-site management of work at the VA facilities. Even the uniforms that plaintiffs wore on site displayed both companies' logos. All of this would support a finding that even after Federal Medical took over the contract, Ben Fitzgerald remained in control of the day-to-day working conditions of employers. On the basis of that evidence, a jury could conclude that Ben Fitzgerald was plaintiffs' "employer."

Because the parties have provided evidence that would permit a jury to conclude either that Ben Fitzgerald was plaintiffs' joint employer or that Federal Medical was their sole employer, summary judgment as to Ben Fitzgerald's status as an employer is inappropriate. Both plaintiffs' and Ben Fitzgerald's motions for summary judgment on that issue are therefore denied.

To the extent that Ben Fitzgerald argues that plaintiffs' claims are barred by the statute of limitations, its motion is also denied. Defendants make the perplexing argument that the "Fourth Amended Complaint lacks any allegations [that Ben Fitzgerald exerted] control over Plaintiffs' wages, hours, or working conditions" after August 2019. To the contrary, that is a major thrust of the complaint. In fact, the complaint explicitly states that Ben Fitzgerald "control[ed] the working conditions of" Russo. More to the point, if a jury concludes that Ben Fitzgerald was plaintiffs' joint employer, then Ben Fitzgerald remained so at all times relevant to this lawsuit. Reddick terminated his employment on April 30, 2023 and Russo remained employed with the defendants when he filed this lawsuit in October 2023. Because a jury could conclude that Ben Fitzgerald

---

[5] Ben Fitzgerald objects to the Court's consideration of Slattery's deposition testimony as rendering an improper lay opinion on the interpretation of a legal contract. But while Slattery responded to a question about the teaming agreement, his deposition testimony discusses his understanding of the business relationship between Federal Medical and Ben Fitzgerald and the responsibilities of each party thereto. As the executive primarily responsible for managing that contract, he is personally knowledgeable and can testify about his understanding of the arrangement. The cases that Ben Fitzgerald cites in support of its unfounded position are neither binding upon this Court nor supportive of Ben Fitzgerald's position. *See Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017) ("A [party's] assertions about facts within her or his personal knowledge can be competent evidence to create a material factual dispute[.]"); *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1242 n.5 (10th Cir. 2002) (discussing the proper use of errata to deposition testimony proffered under Federal Rule 30(e)). For the same reasons, the Court rejects Ben Fitzgerald's objection to Woulfe's statement that she was "joint[ly]" employed by defendants.

United States District Court
Northern District of California

jointly employed both plaintiffs, the statute of limitations does not bar their claims.[6]

### B. Direct liability under the asserted wage and hours laws.

The statutes and associated IWC orders asserted here generally provide for strict liability if an "employer" has violated the law at issue. Slattery moves for summary judgment on his direct liability, arguing that he was not plaintiffs' "employer" as defined by the asserted wage and hour statutes. Separately, plaintiffs and Tate cross-move for summary judgment as to Tate's status as an "employer" for the purposes of direct liability.[7]

In support of his motion, Slattery argues that under California Supreme Court precedent the "definition of 'employer' does not impose liability on individual corporate agents acting within the scope of their agency." *Martinez*, 49 Cal. 4th at 75. Although this "corporate agent" rule shields certain corporate agents from liability, a careful consideration of the California Supreme Court precedents recognizing that exception makes clear that neither Slattery nor Tate fall within the scope of that rule.

The relevant precedents begin with *Reynolds v. Bement*, 36 Cal. 4th 1075 (2005). In that case, the California Supreme Court considered the definition of "employer" as that term is used in the state's overtime wage statutes. The Court recognized that although the statutes used the term "employer," they do not provide a clear definition for the term. The Industrial Welfare Commission (IWC), however, had promulgated an expansive definition of "employer" that the Division of Labor Standards Enforcement relied upon when enforcing "California's labor laws, including IWC wage orders." *Id.* at 1084 (citation omitted). *Reynolds* considered whether a *private plaintiff* could rely upon that IWC definition of "employer" when seeking to vindicate their own rights under the overtime wage statutes. The Court held that private plaintiffs could not rely on the

---

[6] As discussed further below, it is of no moment that the Teaming Agreement was signed by Rosemark and not Ben Fitzgerald. Tate confirmed in his deposition that Ben Fitzgerald "do[es its] government business as Rosemark" and that Rosemark is "not a subsidiary." He further confirmed that although plaintiffs were hired by Ben Fitzgerald, they were working for the Rosemark part of the company.

[7] Plaintiffs did not move for summary judgment as to Slattery's direct liability under the asserted wage and hours laws; rather, they moved for summary judgment only as to his liability under Cal. Lab. Code § 558.1(a).

1  IWC's definition of "employer" and would instead be required to establish employment solely

2  through the common law definition. The Court explained that "[u]nder the common law, corporate

3  agents acting within the scope of their agency are not personally liable for the corporate

4  employer's failure to pay its employees' wages." *Id.* at 1087. Applying that rule, *Reynolds* held

5  that the shareholders, officers, and directors of the corporate defendants in that case were not

6  directly liable for statutory overtime violations.

7       The California Supreme Court walked back much of this holding in *Martinez v. Combs*, 49

8  Cal. 4th 35 (2010). *Martinez* held, contrary to *Reynolds*, although certain wage-and-hour statutes

9  may be silent on the definition of "employer," the Legislature intended, in enacting those statutes,

10  to defer to the IWC's definition of "the employment relationship, and thus who may be liable." *Id.*

11  at 52. There, as here, the relevant IWC order defined "employer" as a person who "employs or

12  exercises control over the wages, hours, or working conditions of any person." *Id.* at 59.

13  "Employs" as used in that definition has two distinct meanings. First, it encompasses the common

14  law "to engage" standard, which applies only to traditional employment relationships defined by a

15  "master and servant relationship."[8] *Id.* at 58. Second, the IWC order expands upon the common

16  law by including the phrase "employ, suffer or permit," which derives from "statutes regulating

17  and prohibiting child labor … between 1904 and 1912." *Id.* at 57–58. That standard "reache[s]

18  irregular working arrangements the proprietor of a business might otherwise disavow with

19  impunity." *Id.* at 58. Thus, the IWC's definition of "to employ" has "three alternative definitions:

20  … (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to

21  work, *or* (c) to engage, thereby creating a common law relationship." *Id.* at 64.

22       In addressing the history of the "suffer, or permit to work" standard, the Court clarified the

23  types of individuals that may be subject to liability for statutory violations. That phrase, borrowed

24  from early 1900s child labor statutes, was understood at the time to create liability for business

25  owners who knew but failed to prevent child labor within their enterprise, "despite the absence of

26

27  ───────────────

28  [8] As relevant to the IWC's definition of "employer," the Court stated that "the verb 'to engage' has no other apparent meaning in the present context than its plain, ordinary sense of 'to employ,' that is, to create a common law employment relationship." *Martinez*, 49 Cal. 4th at 64.

United States District Court
Northern District of California

a common law employment relationship." *Id.* at 69. The Court explained that there is "no reason to refrain from giving ... 'employ' its historical meaning," which extends to "[a] proprietor who knows that persons are working in his or her business ... while being paid less than the minimum wage[.]" *Id.* Such a person "clearly suffers or permits that work by failing to prevent it, while having the power to do so." *Id.* Thus, the inclusion of the "suffer or permit" standard within the IWC wage order made clear that the owner of a business can be held liable for statutory wage-and-hour violations. "[T]he basis of [that] liability is the defendant's knowledge of and *failure to prevent* the work from occurring." *Id.* at 70.

    While adopting a broader definition of employer than *Reynolds*, *Martinez* nonetheless affirmed *Reynolds*'s holding that certain corporate agents cannot be held liable for acting within the scope of their corporate agency. But the Court's treatment of that issue demonstrates that the common law rule does not exempt Slattery or Tate from potential liability. The defendants in *Martinez* included "Combs Distribution Co., together with its principals, Corky and Larry Combs, and its field representative Juan Ruiz." *Id.* at 42-43. Crucially, the Court assessed the liability of the field representative in a manner that was entirely distinct from its treatment of the other defendants—including, as critically important here, the two principals. The Court held that *Reynolds* squarely governed the field representative's liability because the operative complaint asserted that the field representative was "acting in his capacity as [an] agent for Combs," *id.* at 75 (cleaned up), and "the IWC's definition of 'employer' does not impose liability on individual corporate agents acting within the scope of their agency," *id.* But the Court did not apply the *Reynolds* rule to the two individual principals of Combs Distribution. Instead, consistent with the Court's reasoning that the "suffer or permit" definition of employment can confer personal liability upon the owner of a business, the Court assessed the liability of the corporate and individual Combs defendants together by applying the IWC's definition of "employer." Ultimately, the Court held that the individual defendants who were principals of Combs Distribution were not liable because Combs itself did qualify as an employer under the IWC's definition.

    By applying the *Reynolds* rule only to the field representative while applying the IWC's

definition of employment to the principals of Combs Distribution, *Martinez* implicitly held that the corporate agent exception recognized in *Reynolds* does not apply to the owners or controlling shareholders of an entity and that their liability must instead be determined by applying the IWC's definition of employer. Applying that definition, neither Slattery nor Tate is entitled to summary judgment as to his direct liability. If plaintiffs can prove that Slattery and/or Tate fall within the IWC's definition, they may be liable as plaintiffs' employers.[9] The corporate agent rule does not entirely shield them from liability.[10]

Slattery's motion for summary judgment is therefore denied. And for the reasons discussed above as to Ben Fitzgerald's status as a "joint employer," Tate and plaintiffs' motions are similarly denied.

## II.    Defendants' liability under the Fair Labor Standards Act.

Under the FLSA, an "employer" is "person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Ninth Circuit has recognized that the "definition of 'employer' under the FLSA is not limited by the common law concept of 'employer.'" *Lambert v. Ackerley*, 180 F.3d 997, 1011-12 (9th Cir. 1999). An individual who exerts "control over the nature and structure of the employment relationship" or "economic control" is liable under the FLSA. *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983). Courts apply an "economic reality" test and look to the "circumstances of the whole activity" to determine if an employment relationship exists. *Id.* at 1469–70. That test considers whether the alleged employer "(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Id.* at 1470. The parties cross-move for summary judgment, asking the Court to adjudicate whether the individual defendants are liable under the FLSA as a matter of law.[11] Because there is a clear dispute of fact

---

[9] Because Slattery argued only that the corporate agent rule exempts him from liability, the Court need not consider whether he is an "employer" under the "suffer or permit" standard.

[10] Defendants did not move for summary judgment as to the corporate-agent rule's application to Woulfe.

[11] Specifically, Russo moves for summary judgment as to Slattery, Woulfe, and Tate's liability. Of

United States District Court
Northern District of California

that bears upon that question, the Court denies both motions.

Slattery argues that he is not an "employer" under the FLSA because the undisputed evidence shows that he did not directly hire the plaintiffs, communicate with them about meal and rest breaks, discuss with plaintiffs how to record their time, or review their timecards and paychecks. He notes that Woulfe directly supervised plaintiffs and that he delegated final hiring and firing decisions to her. He also states that Woulfe collected plaintiffs' time sheets and was primarily responsible for disciplinary matters.

This evidence does not entitle Slattery to judgment as a matter of law. As plaintiffs demonstrate in response, Slattery was the sole owner, officer, and president of Federal Medical, which itself is a closely held company with only a handful of employees. Although Slattery worked with subcontractors like Ben Fitzgerald and Renhill to supervise and pay his janitorial staff, it is also undisputed that he executed and signed those subcontracting agreements. Although he did not directly hire plaintiffs, Slattery stated in his deposition that he had the final say in hiring and firing employees and also played a role in employee discipline. Slattery further stated in his opening brief that he maintained records of plaintiffs' timecards and paychecks, a central factor in the "economic reality" test. *See id.* The evidence that plaintiffs presented in their own motion is thus sufficient to create a triable issue of fact as to whether Slattery is subject to individual liability under the FLSA.

For similar reasons, plaintiffs are not entitled to summary judgment on the question of Woulfe's FLSA liability. Plaintiffs are correct that Woulfe's status as a supervisor alone does not preclude her from qualifying as an "employer" for the purposes of FLSA liability. *See Boucher v. Shaw*, 572 F.3d 1087, 1093–94 (9th Cir. 2009) ("We have found at least two cases holding that individual managers can be held liable under the FLSA even after the corporation has filed for bankruptcy."). "The touchstone" of a manager's liability is the "economic reality of the relationship." *Id.* at 1091. In support of their motion, Plaintiffs have provided evidence that Woulfe collected and maintained records of the hours they worked. It is undisputed that she hired

the defendants, only Slattery moves for summary judgment.

United States District Court
Northern District of California

United States District Court
Northern District of California

Russo, generally supervised plaintiffs' work, scheduled their work shifts, communicated with plaintiffs about their meal and rest breaks, and had authority over disciplinary matters. Woulfe audited plaintiffs' hours and discussed them with Slattery. She also acted as the conduit between Federal Medical and Renhill to ensure that plaintiffs were paid for their work. But at this stage, this is not sufficiently clear and convincing evidence to demonstrate that Woulfe—as opposed to Slattery, for example—controlled the economic reality of plaintiffs' employment rather than, for example, merely facilitating Slattery's control over plaintiffs' conditions of employment.

Finally, Russo is not entitled to summary judgment as to Tate's or Ben Fitzgerald's FLSA liability because he has not provided evidence that would entitle him to judgment as a matter of law under the "economic control" test. For example, although both Woulfe and Slattery stated that they generally had the power to hire and fire employees, Tate did not admit to having such power. Further, while he had power to set wages before Federal Medical took over the contract, the evidence before the court does not indisputably establish that he retained such power. Although a jury might infer such power from an email from Tate to Slattery asking for approval of small Christmas bonuses for custodial staff, Russo is not entitled to such a presumption on his own motion. Woulfe consulted Tate about her management of the custodial staff, but Tate would often tell her to instead go to Slattery. Because a jury could infer from this evidence that Slatter and/or Woulfe were plaintiffs' employer and that Tate acted in an advisory capacity, the Court denies summary judgment as to his and Ben Fitzgerald's liability under the FLSA.

## III.     Defendants' liability under Cal. Lab. Code Section 558.1(a).

In addition to asserting that the defendants are directly liable for the asserted statutory violations, plaintiffs' complaint asserts these same claims under Section 558.1(a) of the California Labor Code. That provision allows plaintiffs to hold an "employer or other person acting on behalf of an employer" directly liable for certain wage-and-hour violations. Its purpose is to provide employees with a remedy even if their corporate employer has "'hidden [its] cash assets, declared bankruptcy, or otherwise become judgment proof' to avoid adverse wage judgments." *Usher v. White*, 64 Cal. App. 5th 883, 894 (2021) (quoting Assem. Com. On Judiciary, Analysis of Sen. Bill No. 588 (2015–2016 Reg. Sess.) as amended July 1, 2015, p. 4)).

1    This Court has already held that all of plaintiffs' "Labor Code causes of action are either

2    directly referenced in Section 558.1(a) or incorporated into the provisions referenced therein,"

3    such that the individual defendants are potentially liable under that section for the alleged

4    violations. *Russo v. Federal Medical Servs., Inc.*, 744 F. Supp. 3d 914, 921 (N.D. Cal. 2024). The

5    statute imposes three requirements for a court to impose liability. First, the defendant must be an

6    "employer or other person acting on behalf of an employer." *Id.* Second, the plaintiff must

7    demonstrate a violation either (1) of a wages, hours, or days of work order of the Industrial

8    Welfare Commission, or (2) of a statute enumerated within Section 558.1(a) or otherwise

9    incorporated by reference. Third, the plaintiff must demonstrate that the defendant "violate[d ] or

10   cause[d] to be violated" the violation established in step 2.

11       **A.    Step 1: "Employer or other person acting on behalf of an employer."**

12   Slattery is clearly subject to liability under Section 558.1(a) as a "person acting on behalf

13   of an employer." Section 558.1(b) defines "other person acting on behalf of an employer" as a

14   "natural person who is an owner, director, officer, or managing agent of the employer." The

15   parties do not dispute that Slattery was a corporate officer and controlling shareholder during

16   plaintiffs' employment, which makes him an "officer," an "owner," or both. The same is true for

17   Tate. He is the president of Rosemark and the largest shareholder of Ben Fitzgerald. Thus, to the

18   extent plaintiffs seek summary adjudication of this question, their motion is granted. Both Slattery

19   and Tate are "person[s] acting on behalf of an employer" for the purposes of Section 558.1(a).

20   It is less clear, however, whether Woulfe is a "person acting on behalf of an employer" as a

21   "managing agent," as plaintiffs suggest. A "managing agent," as defined by Cal. Civ. Code §

22   3294, is an "employee[] who 'exercise[s] substantial discretionary authority over decisions that

23   ultimately determine corporate policy.'" *Davis v. Kiewit Pac. Co.*, 220 Cal. App. 4th 358, 366

24   (2013) (quoting *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 573 (1999)). The parties did not brief

25   this question in depth. But at this stage, there is enough evidence before the Court to create a

26   dispute of fact as to whether Woulfe exercised sufficient discretion to determine corporate policy

27   or if she merely carried out the orders of her superiors. Plaintiffs' motion is therefore denied

28   insofar as it seeks adjudication of Woulfe's status as Federal Medical's "managing agent."

**B.    Step 2: Violation of an enumerated statute or IWC order.**

Plaintiffs have moved for summary judgment on the question of whether they were unlawfully denied minimum wages, overtime wages, and meal and rest breaks. Plaintiffs, however, fail to provide the necessary evidentiary basis for a ruling in their favor on the minimum wage and overtime claims, and their meal and rest break claims present a clear dispute of fact.

**1.    Minimum wage & overtime violations**

Plaintiffs ask the Court to hold that defendants failed to pay them legally mandated minimum and overtime wages.[12] In support of their motion, plaintiffs have provided the Court with pay stubs from July 2019 through July 2023. Those records tend to show that Renhill paid Russo an hourly wage of $16.28 per hour from July 2019 and through July 2023. Plaintiffs provided similar evidence for Reddick. As plaintiffs note, the City of Palo Alto raised its minimum wage to $16.45 on January 1, 2022 and to $17.25 on January 1, 2023. Many of these pay stubs also show that plaintiffs regularly worked over 80 hours in a pay period, which would qualify them for overtime pay, but the pay stubs do not include a line item for overtime pay. Plaintiffs also provided years of timecards showing that they often worked over 45 hours per week.

Plaintiffs provided these documents through the declaration of counsel but provided no affidavits or declarations confirming their authenticity.[13] The Ninth Circuit has "repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (collecting cases). To properly authenticate evidence for summary judgment, "documents authenticated through personal knowledge must be 'attached to an affidavit that meets the requirements of Fed. R. Civ. P. 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." *Id.*

---

[12] They assert claims under the California minimum wage statutes and applicable IWC wage orders, the California overtime statutes and applicable IWC wage orders, and the FLSA overtime statute.

[13] In his opposition brief, Slattery objects to this evidence on the ground that it was not properly authenticated. Although Slattery included a separate fifty-page list of evidentiary objections as an exhibit to his brief, the Court will not address those objections because, as stated in the Court's Civil Standing Order, any evidentiary objections must be included in a party's brief.

United States District Court
Northern District of California

(citation omitted). Plaintiffs failed to properly authenticate these documents by providing a declaration or affidavit of an individual personally knowledgeable about the records. The authentication requirement is not satisfied simply by virtue of "having been produced in discovery[.]" *Id.* at 777. Although counsel identifies Renhill as having produced the relevant paystubs, defendants themselves "have [not] admitted to producing" the paystubs, and counsel did not provide any declaration from Renhill to verify their authenticity. *Id.* Because these records relate to Russo and Reddick's pay, a declaration from plaintiffs themselves may have sufficed to authenticate the documents. *See id.* at 774 n.8. But absent that, the Court cannot consider this evidence.

Because the only other evidence upon which plaintiffs rely is their own testimony, they have not met their burden to demonstrate a violation of the wage and overtime laws. The Court therefore denies the motion for summary judgment in plaintiffs' favor with respect to the alleged violation of their rights under California minimum wage and overtime laws and the FLSA's overtime requirements.[14]

### 2. Meal and Rest Breaks

Finally, plaintiffs move for summary judgment on their claim that defendants failed to provide them with meal and rest breaks in accordance with California law.

California law requires employers to provide an employee who works over five hours in a day the opportunity to take a meal break of at least thirty minutes. Cal. Lab. Code §§ 226.7, 512. When an employee works more than six hours, the employer must provide the employee with two rest breaks of ten minutes. *Id.* The employer's duty with respect to meal breaks "is an obligation to provide a meal period to its employees." *Brinker Rest. Corp. v. Sup. Ct.*, 53 Cal. 4th 1004, 1040 (2012). But the employer is not required to force the employee to take breaks or "to police meal breaks and ensure no work thereafter is performed." *Id.* That said, "an employer may not

---

[14] Because plaintiffs did not properly authenticate their pay records, the Court also declines to grant plaintiffs' motion seeking summary judgment on their claim that defendants violated Cal. Lab Code § 226, which requires employers to provide "accurate and itemized statement[s]" that containing the statutorily enumerated categories of information.

1    undermine a formal policy of providing meal breaks by pressuring employees to perform their

2    duties in ways that omit breaks." *Id.*

3         Plaintiffs' meal and rest break claims present a classic dispute of fact. Contrary to

4    defendants' suggestion that these are frivolous claims, Russo and Reddick both testified that they

5    generally did not take meal or rest breaks. Russo specifically stated that he was "too afraid to take

6    a break" and that he was "fearful for [his] job." He further stated that Woulfe implied that he could

7    not take a break, even characterizing her pressure to work despite his break as "a threat" to his job.

8    Similarly, Reddick testified that Woulfe heavily implied that he could not take breaks and that he

9    needed "just get [the work] done."

10        Conversely, both plaintiffs testified that Woulfe never clearly told them that they could not

11   take a break. Woulfe stated in her declaration that Federal Medical always provided and

12   encouraged plaintiffs to take breaks at their discretion. She further stated in her deposition that she

13   was rarely on-site to supervise plaintiffs and that they had discretion to take their meal and rest

14   breaks at any time.

15        The evidence before the court creates a dispute of fact as to whether the plaintiffs were

16   prevented from taking their breaks. Plaintiffs' motion is therefore denied.

17   **C.    Step 3: "violates, or causes to be violated"**

18        Liability under Section 558.1(a) attaches only where the defendant "violate[d],or cause[d]

19   to be violated" said violations. The California Supreme Court has yet to interpret these words. But

20   the Court of Appeal considered this question as a matter of first impression in *Usher v. White*. The

21   court interpreted the statute according to its "ordinary meaning," concluding that it imposes

22   liability on an employer or person acting on behalf of an employer when that person was either

> personally involved in the purported violation of one or more of the
> enumerated provisions; or, absent such personal involvement, had
> sufficient participation of the employer, including, for example, over
> those responsible for the alleged wage and hour violations, such that
> the 'owner' may be deemed to have contributed to, and thus for
> purposes of this statute, 'cause[d]' a violation.

27   64 Cal. App. 5th at 886. The "inquiry requires an examination of the particular facts in light of the

28   conduct, or lack thereof, attributable to the 'owner'" and "cannot be determined by any bright line

rule." *Id.* at 897.

Under this standard, the Court cannot say that any party is entitled to summary judgment as to the defendants' personal involvement in any alleged wage or hours violations.

Slattery argues and testified that he was at all times one-step removed from oversight of his employees. He highlights evidence of his various subcontracts for Renhill to serve as his payroll agent and for Rosemark to provide oversight of janitorial services. He also stated in his deposition that he had minimal to no interaction with either plaintiff, that he did not review or approve their paychecks, and that he did not hire or fire them. Indeed, both Russo and Reddick said similar things in their own depositions. But Russo points to statements in Slattery's deposition in which he stated that he plays a role in ensuring that employees log their hours and that he has a longstanding relationship with Renhill's CEO. Slattery also continued working with Renhill despite his possible knowledge of payroll issues. Further, Slattery stated in his deposition that he was ultimately responsible for ensuring compliance with wage and hour laws. The evidence before the Court is therefore sufficient to create a triable issue of fact as to Slattery's personal involvement in the alleged legal violations.

Nor can the Court say that either party is entitled to summary judgment as to Woulfe's liability. Plaintiffs first argue that Woulfe should be liable for the minimum and overtime wage violations because evidence shows that she was involved in hiring, scheduling, and personnel decisions. Plaintiffs point to Woulfe's receipt of a notification about Russo's unpaid overtime balance and her performance of an audit as to unpaid wages owed to Russo. The evidence shows that she at least discussed wages and paychecks with both plaintiffs and collected plaintiffs' time sheets and passed them along to Renhill. But a clear inference from this evidence is that Woulfe was a conduit for passing information from Federal Medical to Renhill. The plaintiffs recorded their hours and sent them to Woulfe who would, in turn, pass them along to Renhill for payment. Further, Slattery's statement in his deposition that he was responsible for ensuring compliance with minimum wage laws creates the inference that Woulfe did not have any personal role in creating the company's wage policies. She even stated in her deposition that she had no role in setting pay rates.

As to the meal and rest break violations, plaintiffs must demonstrate that their employer prevented or discouraged them from taking rest breaks. While both plaintiffs testified that they were fearful of taking breaks and that Woulfe implied that they could not, it is less clear how much direct supervision Woulfe actually performed over their ability to take breaks, given that plaintiffs worked night shifts in California and Woulfe tended to work during the day in Texas. Woulfe also testified that she encouraged plaintiffs to take breaks at their discretion. There is therefore a clear dispute of fact regarding Woulfe's personal involvement in any statutory meal and rest break violations.

Finally, neither side is entitled to summary judgment as to Tate's liability. Although Slattery stated in his deposition that he gave full deference to Ben Fitzgerald in managing personnel matters, the extent to which Tate himself was involved in such matters is less clear. Reddick cites a conversation he had with Woulfe in which she told him that Tate ordered that Reddick's pay be dropped by approximately $3 per hour to account for his healthcare benefit.[15] On the one hand, this conversation appears to have happened before Federal Medical took over the contract, which may indicate that it relates only to Tate's control of Reddick's wages before Federal Medical took over. But because other evidence indicates that Ben Fitzgerald generally managed the day-to-day operations in the same manner both before and after the formal transition of the contract to Federal Medical, a jury could infer from this statement that Tate's control over employee wages continued beyond the execution of the teaming agreement. Further evidence shows that Tate discussed the payment of bonuses to the custodial staff with Slattery and made recommendations to him about such pay. That said, Tate also testified that he typically made recommendations to Slattery. Although Slattery invariably accepted these recommendations, this at least raises an inference that Slattery—and not Tate—was primarily responsible for setting the policy that created the alleged wage and hours violations.

---

[15] Ben Fitzgerald again raises a perplexing evidentiary objection. It argues that the Court should discard this evidence as inadmissible hearsay. But Fed. R. Evid. 801(d)(2) clarifies that a "statement … offered against an opposing party and … made by the party in an individual or representative capacity" is not hearsay.

1    Due to the presence of significant disputes of fact, the motions are denied.[16]

## IV.    Willful violations of employment law.

Plaintiffs finally ask the Court to hold that defendants willfully violated both the FLSA and California law. Where a plaintiff demonstrates that such violations were willful, they are generally entitled to an extension of the operative statute of limitations on their FLSA claims. *See Scalia v. Emp. Sols. Staffing Grp., LLC*, 951 F.3d 1097, 1102 (9th Cir. 2020) ("Ordinarily, a two-year statute of limitations applies to claims under the FLSA. 29 U.S.C. § 255(a). But for a 'willful violation,' the limitations period extends to three years."). Willfulness requires a showing "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

Because plaintiffs are not entitled to summary judgment on any of their wage-and-hour claims, they are not entitled to a ruling that any such violations were willful. But even were this not so, the evidence creates a dispute of fact as to the willfulness of any such violations. The evidence shows that Slattery delegated payroll processing to Renhill and entrusted Woulfe to ensure that hours were properly reported. Reddick testified that he complained to Woulfe about issues with his pay throughout his employment, but Woulfe testified that she had little involvement in setting pay rates. And although Tate contradicted that statement in his own deposition, he also confirmed it by stating that he was responsible for ensuring compliance with minimum wage laws. Further, after Russo's counsel contacted Federal Medical to report underpayment, Slattery asked Renhill to investigate that claim, and Federal Medical thereafter attempted to address the underpayment. If anything, this creates an inference that he was unaware of any violations until Russo reported them. Plaintiffs' evidence may show a lack of attentiveness to the minimum wage and overtime laws, but it is based on conflicting deposition testimony that does not go so far as to show that any of the defendants acted with reckless disregard of the applicable laws.

---

[16] Because the Court declines to hold defendants liable under Cal. Lab. Code § 558.1(a) or the FLSA (discussed below), the Court also denies plaintiffs' motion for summary judgment on their derivative California Unfair Competition Law claim.

United States District Court
Northern District of California

## V.    PAGA Claims.

The parties seek summary judgment on several different questions related to plaintiffs' PAGA claims. The Federal Medical defendants ask the court to grant summary judgment on Reddick's PAGA claims, arguing that they are time-barred. Russo asks the court to hold that he is an "aggrieved employee" and therefore entitled to bring a PAGA claim on behalf of the State. Finally, the Ben Fitzgerald defendants ask the Court to grant summary judgment against Russo's PAGA claims due to defective notice.

### A.    Reddick's PAGA Claims are barred by the statute of limitations.

Claims seeking redress in the form of civil penalties for California statutory violations are generally subject to a one-year statute of limitations. *See* Cal. Civ. Code § 340(a). That provision applies to PAGA, which allows an aggrieved employee to seek civil penalties for their employer's violations of California's wage-and-hour laws. *See* Cal. Lab. Code § 2699. Before filing a civil action, the aggrieved employee must follow the procedural requirements set out in Cal. Lab. Code § 2699.3. One of those provisions requires the aggrieved employee to "give written notice … with the Labor and Workforce Development agency" of the specific provisions the employee alleges that their employer violated.

Defendants move for summary judgment on Reddick's PAGA claims, arguing that he never filed the notice required by Section 2699.3. The evidence before the Court shows that Reddick left his employment with Federal Medical on April 30, 2023 and that his PAGA claim accrued at that time. The Labor Code thus requires him to have filed his LWDA notice by April 30, 2024, which Defendants claim he never did.[17] Although Reddick filed his PAGA *lawsuit* before April 30, 2024, plaintiffs do not provide any evidence of Reddick's LWDA *notice*. The Court therefore grants summary judgment to defendants and dismisses Reddick's PAGA claims with prejudice.

---

[17] Perhaps in tacit acknowledgment of the strength of defendants' argument, plaintiffs moved to amend their operative complaint to remove Reddick's PAGA claims entirely. The Court denied that motion from the bench at its May 8, 2025 hearing on the motion.

**B.      Russo is an "aggrieved employee."**

Russo asks the Court to hold that he is an "aggrieved employee" with standing to pursue PAGA penalties on behalf of the state. "The plain language of section 2699(c) has only two requirements for PAGA standing." *Kim v. Reins Int'l Cal., Inc.*, 9 Cal. 5th 71, 83 (2020). To qualify as an "aggrieved employee," the plaintiff must have been "employed by the alleged violator" and must "allege" that their employer committed a statutory violation against them. *Id.* (quoting Cal. Lab. Code § 2699(c)). Unlike issues typically raised on summary judgment that require the production of evidence, PAGA's standing provision requires only that the plaintiff "allege[] []he had personally suffered at least one Labor Code violation on which the PAGA claim [is] based." *Zuniga v. Alexandria Care Ctr., LLC*, 67 Cal. App. 5th 871, 883 (Cal. Ct. App. 2021). Both statutory requirements are readily satisfied here. The parties do not dispute that Federal Medical employed Russo and the complaint clearly alleges that Federal Medical violated the wage and overtime laws in failing to pay him the prevailing minimum and overtime wage. Russo is therefore an "aggrieved employee" entitled to pursue PAGA claims.[18]

**C.      Russo's PAGA notice to Ben Fitzgerald was not defective.**

Ben Fitzgerald argues that the Court should dismiss Russo's PAGA claims because his PAGA notice failed to properly name Ben Fitzgerald as his employer.

Before filing a civil action under PAGA, Cal. Lab. Code § 2699.3(a) requires an aggrieved employee to "give written notice … [to] the Labor and Workforce Development Agency and by certified mail to the employer of the specific [statutory] provisions … alleged to have been violated, including the facts and theories to support the alleged violation." Russo provided such notice to Ben Fitzgerald on September 29, 2023 by mailing a copy of the notice letter to Tate's

---

[18] In the introduction to their motion, defendants ask the Court to dismiss plaintiffs' representative PAGA claims because they have failed to show admissible evidence of wage-and-hour violations involving employees other than the named plaintiffs. But defendants' cited legal authority, *Estrada v. Royalty Carpet Mills, Inc.*, 15 Cal. 5th 582, 619–20 (2024), stands only for the proposition that a district court may not dismiss a PAGA class action on manageability grounds alone. Although *Estrada* discusses representative evidence, it does hold that an employee must produce evidence of other violations at summary judgment in order to be deemed an aggrieved employee. Defendants' motion is denied without prejudice to any pre-trial motion in limine addressing evidence relating to other employees.

22

United States District Court
Northern District of California

home address. In that letter, he named both "Rosemark Services, LLC" and "Rosemark Commercial Facilities Management Services." He subsequently filed an amended notice on October 20, 2023 and mailed his amended notice to Ben Fitzgerald at the address that Ben Fitzgerald registered with the Texas Secretary of State. Those letters also named Federal Medical and Renhill Staffing Services. The amended copy named the other defendants in this case, including Tate, as Russo's employers, but neither the original nor amended notice listed "Ben Fitzgerald Real Estate Services, LLC."

On that basis, Ben Fitzgerald contends that it never received a proper PAGA notice. Although PAGA requires an employee to provide notice of the factual allegations giving rise to their legal claims before opening a civil case, the statue is less clear as to the specificity an employee must provide in identifying their employer. Ben Fitzgerald does not provide any relevant authority in support of its position, and the Court is not aware of any caselaw addressing the specific question of whether an employer's fictitious "doing business as" name may be used in a PAGA notice.[19] To the extent the California courts have addressed PAGA's notice provision, they have held that it simply requires that the notice state facts sufficient to allow the employer to respond. "Notice to the employer serves the purpose of allowing the employer to submit a response to the agency again thereby promoting an informed agency decision as to whether to allocate resources toward an investigation." *Brown v. Ralphs Grocery Co.*, 28 Cal. App. 5th 824, 836 (2018) (citations omitted). Such notice must go beyond "simply paraphras[ing] the allegedly violated statutes" by providing factual allegations sufficient "for defendants to determine what policies or practices were being complained of, have an opportunity to cure the violations, and prepare a meaningful response." *Id.* at 836, 837-38.

---

[19] Ben Fitzgerald cites *Brown v. Ralphs Grocery Co.*, 28 Cal. App. 5th 824 (2018) for the proposition that a PAGA notice must include "the name and address of the legal entity that is the employer." Ben Fitzgerald Reply at 10. Ben Fitzgerald's use of this language, provided without quotation marks, appears to directly quote *Brown*. But that section of *Brown* does not discuss the PAGA notice requirement. Rather, it quotes Cal. Lab. Code § 226(a), which provides that an *employer* must provide its employees with a paycheck that lists "the name and address of the legal entity that is the employer." In *Brown*, much like this case, the plaintiffs alleged that their employers had failed to follow that statutory requirement.

United States District Court
Northern District of California

Ben Fitzgerald does not argue that Russo's PAGA notice failed to include facts sufficient to apprise it of his claims. Nor does Ben Fitzgerald argue that it misunderstood the PAGA notice as directed to some unknown legal entity. Instead, Ben Fitzgerald makes the purely technical argument that Russo failed to name "Ben Fitzgerald Real Estate Services, LLC." But Russo *did* name Rosemark. And although Ben Fitzgerald characterizes Russo's position as "play[ing] fast and loose" with the facts by referring to "Rosemark," "Rosemark Services, LLC" and "Rosemark Commercial Management Facilities" interchangeably, a closer review of the record reveals that it may be Ben Fitzgerald, not Russo, that is playing a shell game. Tate stated in his deposition that Ben Fitzgerald and Rosemark are one and the same and *not separate legal entities*. Ben Fitzgerald "does business as" Rosemark.[20] A screenshot of Ben Fitzgerald's website includes a logo identifying the company as "Rosemark Commercial Facilities Management Facilities," the very same employer listed in Russo's PAGA notice. Given Tate's admission that he ran Rosemark during Russo's employment, defendants rightfully do not argue that Tate did not understand that the notice was directed at Ben Fitzgerald.[21]

An employer cannot hold itself out to the public under a fictitious name and then use that legal fiction as a shield when their employee attempts to sue them in good faith. Russo satisfied the purpose of the PAGA notice provision by providing Ben Fitzgerald with clear notice of the charges against it. Whether the notice referred to "Ben Fitzgerald" or "Rosemark" is of no moment. Ben Fitzgerald's motion for summary judgment on Russo's PAGA claim is therefore denied.

---

[20] In California, "use of a fictitious business name does not create a separate legal entity." *Pinkerton's Inc. v. Sup. Ct.*, 49 Cal. App. 4th 1342, 1348 (1996). To the extent Ben Fitzgerald argues that Russo's dismissal of Rosemark Services, LLC from this lawsuit bars precludes him from now identifying Ben Fitzgerald as Rosemark, the opposite is in fact true. "A corporation may be sued by its fictitious business name, [but] once its true name is discovered, all further proceedings should be in the corporate name." *Id.* at 1349.

[21] Ben Fitzgerald argues that Russo has shown no evidence that Ben Fitzgerald or Tate ever received the PAGA notice. But because Ben Fitzgerald does not dispute that Russo sent the notice to the correct address, he is entitled to a presumption of receipt.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the reasons sated above, the Court holds as follows:

- The parties' motions regarding Ben Fitzgerald's status as plaintiffs' employer and the related statute of limitations issue are denied.

- Slattery, Tate, and plaintiffs' motions as to Slattery and Tate's status as plaintiffs' "employer" for the purposes of direct liability are denied. The "corporate agent" rule does not apply to Slattery or Tate, either of whom may be held liable upon a showing that they satisfy the IWC's definition of an employer.

- All motions regarding FLSA liability are denied.

- For the purposes of liability under Cal. Lab. Code § 558.1(a), Slattery and Tate are "person[s] acting on behalf of an employer." All other motions related to Section 558.1(a) are denied.

- Plaintiffs' motions regarding defendants' alleged willful violations of employment law are denied.

- Reddick's PAGA claims are dismissed with prejudice.

- Russo is an "aggrieved employee" with standing to pursue his representative PAGA claims.

- Ben Fitzgerald's motion to dismiss Russo's PAGA claim is denied.

**IT IS SO ORDERED.**

Dated: August 5, 2025

P. Casey Pitts
United States District Judge